**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
CORA HOUSTON,                  )
                               )
          Plaintiff,           )
                               )
     v.                        )     Civil Action No. 04-2218 (RWR)
                               )
SECTEK, INC.,                  )
                               )
          Defendant.           )
_____)
```

<u>MEMORANDUM OPINION</u>

Plaintiff Cora Houston brings claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 against defendant SecTek, Inc., alleging under each statute race discrimination, a racially hostile work environment, and constructive discharge. SecTek moves for summary judgment, contending that Houston did not establish a prima facie case of either racially disparate treatment or a racially hostile work environment; that even if she did, she has not rebutted the legitimate, nondiscriminatory reasons offered by Sectek for its actions and has not established that she availed herself of SecTek's corrective process; and that she was not constructively discharged.  While Houston has established that she was subject to an adverse employment action, she has not shown that SecTek's intent was discriminatory even if its proffered reason was pretextual, and she has failed to establish her hostile work environment and constructive discharge

- 2 -

claims.  Accordingly, SecTek's motion for summary judgment will be granted.

<u>BACKGROUND</u>

Houston worked as a Level 3 Information Security Specialist for USATREX, a company which provided security services to the U.S. Environmental Protection Agency ("EPA").  (Compl. ¶ 6; Pl.'s Stmt. of Material Facts ("Pl.'s Stmt.") ¶ 38.)  Houston worked with Jose Martinez, a Level 4 Senior Information Security Specialist.  (Pl.'s Stmt. ¶ 40.)  Houston provided technical support to the EPA's National Security Information program by, among other things, providing briefings, delivering documents, and working with EPA security representatives and document control officers.  (Compl. ¶ 6.)  During her time as a USATREX employee, Houston regularly performed higher level tasks that were officially Martinez's responsibilities.  (Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. ("Pl.'s Mem."), Ex. A at 76.)

In July 2000, SecTek replaced USATREX as the contract provider of security services to the EPA.  (Compl. ¶ 8.)  SecTek offered and Houston accepted a position as a Level 3 Information Security Specialist for a ninety-day probationary period.  (<u>Id.</u>)  Her job description did not change, as her responsibilities were set out in the EPA contract.  (Pl.'s Mem., Ex. A at 248-49.)  SecTek also hired Martinez as a Level 4 Senior Information Security Specialist.  (Def.'s Mem. of P. & A. in Supp. of Def.'s

Mot. for Summ. J. ("Def.'s Mem."), Ex. 4 at 44.)  At SecTek,

Andrea Czeck, a Deputy Program Manager of Information Security,

supervised both Houston and Martinez.  (Pl.'s Stmt. ¶ 47.)  Czeck

determined that Houston was performing duties that were not

assigned to her position.[1]  (Id. ¶ 49.)  Czeck later took away the

level 4 duties Houston had been performing, assigned them to

another employee, and diminished Houston's level 3 duties, leaving

her mostly administrative and clerical duties such as destroying

and delivering classified documents.  (Compl. ¶ 9; Pl.'s Stmt.

¶¶ 49-53.)

    Houston also alleges that on a daily basis Czeck treated her

in an unprofessional and belittling manner.  (Compl. ¶ 11.)  On

one occasion, Czeck "threw [a memorandum] on Ms. Houston's desk

and sarcastically instructed her to, 'Try again.'"  (Pl.'s Stmt.

¶ 56.)  Czeck also "often accused Ms. Houston of not telling her

the truth or having 'something to hide'" and accused her of

missing deadlines.  (Id. ¶¶ 57, 60.)  When Houston would leave the

---

[1] The job description for a Level 3 Security Specialist
provided that

> [u]nder the supervision of the DPM/IS, shall provide
> technical support for the Agency nationwide NSI
> program[,] [s]hall prepare and conduct NSI training for
> EPA Security Representatives and Document Control
> Officers (DCO) nationwide[,] [s]hall act as a courier
> to carry NSI up to TOP SECRET between EPA and other
> Federal departments and agencies, [and s]hall conduct
> initial and annual refresher NSI briefings.

(Pl.'s Mem., Ex. D at 0136.)

- 4 -

office to deliver confidential documents to the EPA, Czeck would
"quiz[] Ms. Houston with suspicion about the lengths of her
travels" and would time the length of Houston's trips.  (Id.
¶ 58.)  Czeck required that Houston be accompanied by a co-worker
when meeting government clients, even though no other Sectek
employee was subject to such a requirement.  (Id. ¶ 62.)
Houston's classified document safe was removed and placed in
Czeck's office.  (Id. ¶ 63.)  Upon the conclusion of Houston's
ninety-day probationary period, Czeck extended it by an additional
forty-five days "because her performance had been less than
satisfactory."  (Id. ¶ 72 (internal quotations omitted).)  Ten
days after Czeck extended her probationary period, Houston
received Czeck's performance evaluation, which rated Houston's
performance as either "unsatisfactory" or "needs improvement" in
each rating category.  (Id. ¶¶ 75, 78.)  Czeck also provided a
written list of the duties she believed Houston was responsible
for performing, based on the EPA contract.[2]  (Pl.'s Mem., Ex. A at

---

[2] Czeck believed that Houston's responsibilities were to

1. Provide technical support to EPA NSI programs.
2. Primary courier for NSI material.  Responsible for
couriering material between EPA facilities and other
government agencies in a timely manner.
3. Responsible for receiving, logging, controlling,
and destroying NSI information that comes in and goes
out of EPA.  4. Maintain a NSI document database.
Ensuring it is kept current.  5. On an as needed
basis, provide administrative/clerical support to the
Security Office.  6. On an as needed basis, schedule,
prepare and conduct NSI training for EPA Security
Representatives and Document Control Officers

- 5 -

77; Ex. I at 47.)  Houston believed that the performance evaluation was wholly inaccurate (Pl.'s Stmt. ¶¶ 79-80), and she alleges that she heard rumors that she was going to be fired. (Id. ¶ 92.)  She submitted her resume to another employer, and upon receiving an offer for a position, Houston tendered her resignation to SecTek.  (Id. ¶ 94; Pl.'s Mem., Ex. A at 169.)

SecTek moves for summary judgment, arguing that Houston has failed to establish a prima facie case of disparate treatment and that she has failed to rebut the proffered legitimate, nondiscriminatory reason for her treatment; that Houston has failed to establish a prima facie case of hostile work environment and that she never availed herself of SecTek's corrective or preventative procedures to avoid the harm; and that she was not constructively discharged.  Houston opposes summary judgment, arguing that there are disputed material facts bearing on whether SecTek discriminated against her.

## DISCUSSION

On a motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a

---

nationwide.  7. On an as needed basis, prepare, conduct and update initial, annual refresher, termination, and foreign travel briefings.  8. On an as needed basis, provide support in preparing and sending memoranda and materials to EPA sites for briefing assistance on cleared individuals.  This includes tracking to ensure briefings are conducted and documented.

(Def.'s Mem., Ex. 11 at 0108.)

trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Summary judgment may be granted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009). A material fact is one that is capable of affecting the outcome of the litigation. Liberty Lobby, Inc., 477 U.S. at 248. A genuine issue is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," id., as opposed to evidence that "is so one-sided that one party must prevail as a matter of law." Id. at 252. A court considering a motion for summary judgment must draw all "justifiable inferences" from the evidence in favor of the nonmovant. Id. at 255. The nonmoving party, however, must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmovant must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (emphasis omitted). In the end, "the plain language of Rule 56(c) mandates the entry of summary

- 7 -

judgment . . . against a party who fails to make a showing
sufficient to establish the existence of an element essential to
that party's case, and on which that party will bear the burden of
proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986). The burdens of persuasion and production are identical
under Title VII and § 1981. Killian v. Georgetown Day School,
Civil Action No. 05-1925 (EGS), 2007 WL 1541391, at *4 (D.D.C.
May 24, 2007).

I.   DISPARATE TREATMENT

     A plaintiff bringing discrimination claims under Title VII or
§ 1981 without direct evidence may employ the burden-shifting
framework approved in McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802 (1973), when the defendant denies that its actions were
motivated by the plaintiff's race. Mungin v. Katten Muchin &
Zavis, 116 F.3d 1549, 1553-54 (D.C. Cir. 1997); see also Iweala v.
Operational Techs. Servs., Inc., 634 F. Supp. 2d 73, 81 (D.D.C.
2009) (noting that the "same framework applies to § 1981 claims"
as applies to Title VII claims). Under McDonnell Douglas, the
plaintiff first "has the burden of proving by the preponderance of
the evidence a prima facie case of discrimination." Wiley v.
Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007). The prima facie
case for a disparate treatment claim requires that Houston show:
"(1) that [she] is a member of a protected group; (2) that [she]
suffered an adverse employment action; and (3) the unfavorable

- 8 -

action gives rise to an inference of discrimination." <u>Felder v.
Johanns</u>, Civil Action No. 06-910 (CKK), 2009 WL 187778, at *15
(D.D.C. Jan. 27, 2009).  However, the D.C. Circuit has clarified
the application of <u>McDonnell Douglas</u> and concluded that

> [i]n a Title VII disparate-treatment suit where an
> employee has suffered an adverse employment action and
> an employer has asserted a legitimate,
> non-discriminatory reason for the decision, the district
> court need not - *and should not* - decide whether the
> plaintiff actually made out a prima facie case under
> *McDonnell Douglas*.  Rather, in considering an employer's
> motion for summary judgment or judgment as a matter of
> law in those circumstances, the district court must
> resolve one central question: Has the employee produced
> sufficient evidence for a reasonable jury to find that
> the employer's asserted non-discriminatory reason was
> not the actual reason and that the employer
> intentionally discriminated against the employee on the
> basis of race, color, religion, sex, or national origin?

<u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir.
2008).  This condensed inquiry does not change the plaintiff's
burden.  "The ultimate burden of persuading the trier of fact that
the defendant intentionally discriminated against the plaintiff
remains at all times with the plaintiff." <u>Texas Dept. of Cmty.
Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).  A court looks to
whether a reasonable jury could infer intentional discrimination
from all of the evidence including: 1) the plaintiff's prima facie
case, 2) evidence presented to attack the employer's proffered
explanation for its actions, and 3) further evidence of
discrimination such as evidence of discriminatory statements or
attitudes by the employer. <u>Carter v. George Washington Univ.</u>, 387

- 9 -

F.3d 872, 878 (D.C. Cir. 2004).  A plaintiff can show in a number of ways that the employer's proffered explanation for its actions is a pretext, including by "produc[ing] evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances" or "demonstrat[ing] that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision."  Brady, 520 F.3d at 495.  A plaintiff can also discredit the employer's reason by "pointing to[] changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker."  Id. at 495 n.3. However, to show pretext, a plaintiff "'must show *both* that the reason was false, *and* that discrimination . . . was the real reason.'"  Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

A.  Adverse employment action

SecTek argues that Houston did not suffer an adverse action because she "did not undergo any change in employment status, never sought any promotion, was never reassigned, and there was never any change in her benefits, hours, work, location or compensation."  (Def.'s Mem. at 14.)  Adverse employment actions

are "not confined to hirings, firings, promotions, or other discrete incidents." Halcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006).  In this circuit, entirely subjective injuries such as dissatisfaction with a reassignment, embarrassment, or loss of reputation do not qualify as adverse actions, but "the threshold is met when an employee 'experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.'" Id. (quoting Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).  If "a reasonable juror could find that [a] reassignment left the plaintiff with significantly diminished responsibilities[,]" the question of whether the reassignment constitutes an adverse employment decision should not be taken from the jury.  Czekalski v. Peters, 475 F.3d 360, 365 (D.C. Cir. 2007).  In Halcomb, the court noted that the plaintiff "never suffered a reduction in grade, pay, or benefits[,]" but still concluded that a reasonable jury could conclude that the plaintiff suffered an objectively tangible harm due to "an extraordinary reduction in responsibilities that persisted for years[.]"  433 F.3d at 902.

SecTek concedes that Czeck took job responsibilities away from Houston and reassigned them to another employee.[3]  (Def.'s

---

[3] Houston also argues that she received a poor evaluation from Czeck.  However, "poor performance evaluations are [not]

- 11 -

Stmt. ¶ 10.)  Houston further argues that the removal of
responsibilities left her with a position requiring less skill and
knowledge.  (Pl.'s Mem. at 35 (stating that after the
reassignment, Houston's duties were primarily "clerical" and she
no longer performed briefings and training for agency staff);
Ex. A at 70-73.)  Because a reasonable jury could find that
Houston suffered from "diminished [] programmatic
responsibilities" (Pl.'s Mem. at 35), Houston has provided
sufficient evidence to establish that she has suffered an adverse
employment action.

     B.   Legitimate non-discriminatory reason and pretext

     SecTek asserts as a legitimate non-discriminatory reason for
Houston's treatment that a "realignment of Plaintiff's duties
[was] necessary to conform to the terms of the EPA contract."
(Def.'s Mem. at 17.)  Prior to the realignment, Houston "was doing
more than she was supposed to be doing."  (Id., Ex. 4 at 45.)
Czeck wanted Houston's job duties to conform to a position
description and reassigned tasks "based on what's in the contract
as to exactly what their specific functional areas were."  (Id.,
Ex. 4 at 47.)  Czeck believed that Houston should not be doing
work above her level because Czeck "could not fairly evaluate her

_____

necessarily adverse actions" under Title VII when they do not
affect the employee's grade or salary.  Taylor v. Small, 350 F.3d
1286, 1293 (D.C. Cir. 2003) (alteration in original).  Houston
does not allege any changes to her grade or salary.

- 12 -

if she was doing more than what was required of her." (Id., Ex. 4 at 46.)

Houston argues that SecTek's reason is a pretext because Czeck not only removed the Level 4 duties that Houston had been performing, but she also "took away Ms. Houston's duties that were to be specifically performed by the [L]evel 3 specialist under the contract" (Pl.'s Mem. at 42), and she relegated Houston to performing the duties of a lower, non-technical position. (Id. at 23.)  In coming to this conclusion, Houston relies on the job description for a Level 3 Information Security Specialist, which does not include administrative duties. (Pl.'s Mem., Ex. D at 0136.)  She also relies on her affidavit asserting that she "was only allowed to perform minor duties including some clerical duties that did not fall within the job description for a technical Information Security Specialist Level 3." (Id., Ex. C at 11.[4])

The Level 4 duties Houston performed for USATREX were outside of her job responsibilities, and Czeck's removal of these duties would be consistent with Sectek's proffered legitimate non-discriminatory reason.  On the other hand, inconsistencies between Czeck's list of Houston's duties and the EPA contract do cast doubt on the genuineness of Czeck's explanation for the reassignment of duties.  For example, the updated job description

---

[4] This page number, missing from the document, is supplied by the Court.

- 13 -

includes as a responsibility providing administrative and clerical support to the Security Office, a duty that does not appear in the EPA contract.  Czeck's list of duties also modifies some of the contractually required duties, such as conducting initial and annual refresher National Security Information briefings, to be performed on an "as needed basis."  (Compare Def.'s Mem., Ex. 11 at 0108 with Pl.'s Mem. Ex. D at 0136.)

Even if SecTek's reason was false, however, Houston offers insufficient evidence to support her assertion that discrimination was the real reason for the change in her duties.  In Czekalski, relied on by Houston, the plaintiff offered "independent evidence that [her supervisor] harbored discriminatory attitudes toward women."  475 F.3d at 368.  The Czekalski plaintiff provided evidence of other employees who testified that the supervisor acted in a discriminatory manner toward women and substantiated their testimony by detailing specific events that had occurred. Id.  Here, to establish a discriminatory motive, Houston proffers statements by other SecTek employees alleging that "Czeck appeared to have a general enmity toward African-American employees." (Pl.'s Mem. at 37.)

Houston cites a statement made by Anne Caffee, an office manager holdover from USATREX, in an interview with an investigator that Czeck "had a problem with black women" and "thought that black women should bow down to her."  (Pl.'s Mem.,

- 14 -

Ex. O at 1.)  Title VII forbids an employer from letting precisely that type of attitude prompt an adverse employment action. However, unlike in <u>Czekalski</u>, Caffee does not detail any specific facts or events that corroborate or place in context her conclusory assertion about Czeck's discriminatory attitude toward African-Americans.  In fact, in the same interview, Caffee provided an alternative explanation for Czeck's behavior, an explanation for which she did provide specific events as corroboration: "[Czeck] was jealous of [Houston's] relationship with the EPA clients."  (<u>Id.</u>)  To support this claim, Caffee explained that "[Czeck] began to time [Houston] when she went upstairs to the EPA.  Later [Czeck] insisted that [Houston] not deal with the EPA, but the EPA people did not like [Czeck] and went over her head to deal with the company."  (<u>Id.</u>)

Houston also cites a statement by Vivian Porter, a former SecTek employee, who believed that Czeck treated Houston differently than Czeck treated other employees.  (<u>Id.</u>, Ex. P at 0041.)  While Porter noted that the office was staffed by "predominately African American personnel[,]" she never stated that the demographics of the office motivated Czeck's behavior. (<u>Id.</u>)  Instead, Porter, too, believed that the true motivation for Czeck's behavior was that "[Czeck] felt that Ms. Houston was going over her head[.]"  <u>Id.</u>  Houston also relies on a statement by Ernest Howe, an EPA government program officer, that Czeck's poor

evaluations of Caffee, who is also an African-American woman, and Houston may have been motivated by discrimination.  (Pl.'s Mem. at 29.)  However, Howe explicitly stated that he was "not implying racial discrimination" and instead believed that SecTek may have been treating employees hired from the previous contract differently than newly hired employees.  (Id., Ex. U at 0035.)

The evidence Houston cites, considered in its full context, is not enough from which to reasonably infer that Czeck's true motivation for her treatment of Houston was racially discriminatory.  Because Houston has not shown "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race," Brady, 520 F.3d at 494 (emphasis added),[5] summary judgment will be granted for the defendant on the disparate treatment claim.

II.  HOSTILE WORK ENVIRONMENT

To establish a prima facie case of a racially hostile work environment, a plaintiff must show that (1) she is a member of a

---

[5] SecTek also argues that Houston has failed to make out a prima facie case because she cannot demonstrate that SecTek treated similarly situated persons differently.  In light of Brady, the prima facie case need not be assessed where the plaintiff has suffered an adverse employment action and the defendant has proffered a legitimate non-discriminatory reason. 520 F.3d at 494.  Therefore, any failure to show that SecTek treated similarly situated persons differently is not dispositive.

protected class; (2) she was subject to unwelcome harassment;
(3) the harassment occurred because of her race; (4) the
harassment had the effect of unreasonably interfering with her
work performance and creating an intimidating, hostile, or
offensive working environment; and (5) the employer knew or should
have known of the harassment, but failed to take any action to
prevent it. Roberson v. Snow, 404 F. Supp. 2d 79, 96-97 (D.D.C.
2005). "A hostile work environment exists when 'the workplace is
permeated with discriminatory intimidation, ridicule, and insult
that is sufficiently severe or pervasive to alter the conditions
of the victim's employment and create an abusive working
environment[.]'" Id. at 97 n.8 (quoting Harris v. Forklift Sys.,
Inc., 510 U.S. 17, 21 (1993) (internal quotation marks omitted));
see also Faragher v. Boca Raton, 524 U.S. 775, 788 (1998) (stating
that the conduct "must be extreme to amount to a change in the
terms and conditions of employment"). Courts should consider all
the circumstances, including the "'frequency of the discriminatory
conduct; its severity; [and] whether it is physically threatening
or humiliating, or a mere offensive utterance.'" Faragher, 524
U.S. at 787-88 (quoting Harris, 510 U.S. at 23). Not all abusive
behavior creates a hostile work environment; the hostile work
environment must be the result of discrimination based on a
protected status. Roberson, 404 F. Supp. 2d at 97.

- 17 -

The D.C. Circuit has found that even constant yelling and hostile behavior, and isolated references to a protected status may be insufficient to support a hostile work environment claim. George v. Leavitt, 407 F.3d 405, 408, 416-17 (D.C. Cir. 2005), concluded that statements by three employees over a six-month period that the plaintiff should "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved were isolated instances that did not rise to the level of severity necessary to find a hostile work environment. In Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004), the plaintiff's allegations that her employer humiliated her at meetings, screamed at her in one instance, told her to "shut up and sit down" in another instance, and treated her in a manner that was "constantly hostile and hypercritical" did not amount to a hostile work environment, even though these actions may have been disrespectful and unfair. Similarly, the fact that an employee and his immediate supervisor repeatedly "butted heads" and that the supervisor frequently yelled at the employee during discussions about his work and "threatened" job-related consequences for the employee's refusals to meet workplace expectations did not demonstrate a hostile work environment pervaded by discrimination. Franklin v. Potter, Civil Action No. 07-1205 (ESH), 2009 WL 533071, at *30 (D.D.C. Mar. 4, 2009).

- 18 -

Moreover, <u>Hussain v. Gutierrez</u>, Civil Action No. 07-1364 (HHK),
2008 WL 5129424, at *5 (D.D.C. Dec. 1, 2008), concluded that
"complaints over undesirable job responsibilities and office
arrangements do not support a hostile work environment cause of
action."

SecTek argues that Houston has failed to establish the prima
facie case for her racially hostile work environment claim.
(Def.'s Mem. at 18-20.)  Houston asserts that she was "forced to
endure attacks on her personal integrity on a daily basis," had
her responsibilities reduced, and was accused of lying.  (Pl.'s
Mem. at 38.)  Czeck allegedly spoke to Houston in "a belittling
tone, if she was not ignoring Ms. Houston's inquiries
altogether[,]" made "sarcastic remarks," and had a "dismissive
attitude."  (Pl.'s Stmt. ¶¶ 54-55.)  Houston neither alleges that
Czeck made any racially based comments nor factually demonstrates
how race motivated Czeck's behavior.  Allegations of undesirable
job assignments or modified job functions and of Czeck's
unprofessional and offensive treatment are not sufficient to
establish that Houston's work environment was permeated "with
discriminatory intimidation, ridicule, and insult."  <u>Roberson</u>, 404
577 F. Supp. 2d at 97 n.8.  Czeck's alleged behavior, while
inappropriate, was not severe enough to alter the conditions of
Houston's employment and create an abusive working environment.
See <u>Franklin</u>, 2009 WL 533071, at *29 (describing the hostile work

- 19 -

claim as a demanding standard that does not create a cause of action for the "ordinary tribulations of the workplace"). Therefore, Houston has failed to satisfy the required elements of her racially hostile work environment claims.

III. CONSTRUCTIVE DISCHARGE

To establish constructive discharge, a plaintiff must prove that "(1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment." Lewis v. District of Columbia, 653 F. Supp. 2d 64, 81 (D.D.C. 2009). A plaintiff must demonstrate that the workplace was so intolerable that it would have caused a reasonable employee to resign. Harris v. Wackenhut Servs., Inc., 590 F. Supp. 2d 54, 80 (D.D.C. 2008). Aggravating factors "are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job." Veitch v. England, 471 F.3d 124, 130 (D.C. Cir. 2006). "Generally, a failure to promote will not constitute constructive discharge, nor will a change in job duties, a transfer, . . . criticism, pressure from a supervisor, or being ignored by co-workers." Veitch, 471 F.3d at 131 (internal quotation marks omitted).

Houston has not shown that intentional discrimination existed, and her constructive discharge claim must fail. See

Sewell v. Chao, 532 F. Supp. 2d 126, 144 (D.D.C. 2008) (noting
that because the court "has already concluded that plaintiff
cannot make out a case of age discrimination or hostile work
environment[,] [t]herefore by definition, summary judgment must
also be granted on the constructive discharge claim").

Even if Houston could show discrimination, she has not
demonstrated that the workplace was so intolerable that it would
have caused a reasonable employee to resign.  Czeck's accusations
that Houston had something to hide and inquiries about the length
of Houston's trips to EPA may have been annoying or unpleasant for
Houston.  However, this friction was not marked by "physical
threats, abusive or offensive language or any other
characteristics of extreme conduct."  Lewis, 653 F. Supp 2d at 82
(internal quotation marks omitted).  Moreover, Czeck's extension
of Houston's probationary period was effectively a decision not to
promote Houston to a non-probationary position, and Veitch refused
to recognize a failure to promote as a basis for constructive
discharge.  And even if hearing a rumor from co-workers that
SecTek intended to terminate her (Pl.'s Mem., Ex. A at 99-100)
contributed to her applying for a job she accepted from another
company (Pl.'s Mem., Ex. A at 166-69) that paid more than her
position paid at SecTek (Def.'s Stmt. ¶ 30), Houston has not
demonstrated that SecTek deliberately circulated that rumor or did
so to make her working conditions intolerable.  Houston has not

- 21 -

established that she left SecTek because the work environment was
objectively intolerable, leaving her no choice to resign.  See
Harris, 590 F. Supp. 2d at 80 ("[A] constructive discharge 'does
not occur when an employee leaves an unpleasant but objectively
tolerable job because alternatives have become more attractive,
even if the employer's misbehavior causes the unpleasantness.'"
(quoting Taylor v. FDIC, 132 F.3d 753, 766 (D.C. Cir. 1997))).

## CONCLUSION

Because Houston has presented evidence that Czeck reduced her
job responsibilities, she has shown an adverse employment action.
However, Houston has not presented sufficient evidence to show
that the proffered explanation of realigning her responsibilities
to conform with the terms of the EPA contract were pretextual, nor
has she presented sufficient evidence of a hostile work
environment or constructive discharge.  SecTek's motion for
summary judgment therefore will be granted.  An appropriate Order
accompanies this Memorandum Opinion.

SIGNED this 28th day of January , 2010.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge